**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TIANYI WEI,

                       Plaintiff,

      -against-

ERIK FANGSHEN WANG; XIANJUN MENG *a/k/a* JACKY
MENG; SILVIA SIU *a/k/a* XIAO BING; JAMES HUANG
*a/k/a* HUANG JIN; CANBO INTERNATIONAL GROUP,
LTD.; BEIJING CANBO GELI INTERNATIONAL
CONSULTING, LTD.; PHILLIP T. MENDIOLA LONG;
RUDY ASUNCION PAMINTUAN; AMERICAN
NORTHERN MARIANAS ECONOMIC DEVELOPMENT
FUND, LLC; AMERICAN NORTHERN MARIANAS
REGIONAL CENTER, LLC; BRIDGE INVESTMENT
GROUP *a/k/a* BIG; BEIJING JIABAO ZHOULI
CONSULTING CO., LTD; AND BEIJING GELI LAW FIRM,

                    Defendants.

Case No. _____

Jury Trial Demanded

## **COMPLAINT**

       Plaintiff Tianyi Wei ("Plaintiff"), by and through her attorneys, The Postlethwaite Law

Firm PLLC, as and for her Complaint against Defendants Erik Fangshen Wang; Xianjun Meng

a/k/a Jacky Meng; Silvia Siu a/k/a Xiao Bing; James Huang a/k/a Huang Jin; Canbo International

Group, Ltd.; Beijing Canbo Geli International Consulting, Ltd.; Phillip T. Mendiola Long; Rudy

Asuncion Pamintuan; American Northern Marianas Economic Development Fund, LLC;

American Northern Marianas Regional Center, LLC; Bridge Investment Group a/k/a BIG;

Beijing Jiabao Zhouli Consulting Co., Ltd.; and Beijing Geli Law Firm (collectively, the

"Defendants"), alleges as follows:

## **NATURE OF THE ACTION**

      1.    The Tinian Wyndham Ocean View Resort located in the United States Northern

Mariana Islands is purported to be an exclusive, luxury travel destination funded by foreign

investors under a USCIS-approved EB-5 investment program, sitting on 385,000 square feet of prime ocean-facing real estate located on the Island of Tinian, one of three principal islands comprising the American Commonwealth of the Northern Mariana Islands ("Project").  Lodging accommodations include the Tinian Diamond Hotel, a six-star 300 room luxury hotel, and the Tinian Diamond Suites, containing thirty-six double suites perfectly suited for extended stays. Visitors enjoy a bevy of dining and shopping options available at any one of the seven restaurants and four retail stores, all of which are within walking distance of the main attraction – the Tinian Diamond Casino.  At the Casino, which employs hundreds of people living on Tinian and its adjacent islands, visitors are immersed in a high-end gambling entertainment experience and select their game of choice from the 150 "Las Vegas-style" tables and 175 slot machines. Travel to and from the island is easy via the Diamond Ferry, which seamlessly shuttles visitors to the Resort where they are welcomed by the majestic Tinian Port Commercial Center which also includes offices and conference rooms for discerning VIPs.  The Resort – constructed from the ground up under the supervision of the United States Citizenship and Immigration Services and with the support of the United States government – is managed by the worldclass Wyndham Hotels and Resorts team and its operations are led by experienced real estate developers.

2.      This magnificent description of the Resort, in combination with its designation as a United States government-approved regional center qualified to receive foreign investments through the EB-5 Immigrant Investment Program, was used to lure Plaintiff Tianyi Wei, a Chinese national, into investing $800,000.00 into Defendant American Northern Marianas Economic Development Fund LLC, a New York-based limited liability company financing the Resort.

3.      In exchange for Plaintiff's capital investment and payment of the requisite additional $80,000.00 "administrative fee," Plaintiff would not only own a modest equity interest in the Resort and its future profits, but she would also obtain a permanent residency ("Green Card") within the United States under the EB-5 Program. The Project turned out to be a deliberate investment fraud and none of the Project's rosy prospects were true. The Defendants embezzled the investors' funds totaling nearly $70 million.

4.      Plaintiff was told her investment would entitle her to ownership in this, the largest luxury resort and casino in the history of the American territory in Tinian, Northern Marina Islands:



5.      At the time of Plaintiff's investment in April 2023, however, the "Resort" pictured above and splashed throughout various brochures and presentations did not exist.  It was a total scam.

6.      In reality, after eight years of development and construction to the tune of $75 million, the vast majority of which was sourced from funds raised through the EB-5 Program, the Resort was nothing more than a refurbished warehouse and a two-story apartment building half

of which was converted into "hotel rooms" and the other half used exclusively as Defendant, the Project developer, Bridge Investment Group's onsite office suite.

7.     As Plaintiff recently learned, development of the Resort began in 2014 with a projected total cost of $143 million. In May 2022, the U.S. Citizenship and Immigration Services (USCIS) launched a fraud investigation into the Resort and unearthed undeniable evidence of rampant misappropriation of funds after site visits to the Resort by USCIS officials on May 9 – 11, 2022.  The Tinian-based Defendant American Northern Marianas Regional Center LLC's status as a USCIS-registered "regional center" under the EB-5 Program was revoked.  Under the EB-5 Program, a "regional center" is a privately owned entity located in the United States that is authorized by the USCIS to raise and pool investment capital from foreign investors to finance projects located in typically underdeveloped geographic regions in the United States to expand local economic development. To remain in good standing to continue to qualify for the EB-5 U.S. immigration investment program, a project must meet rigorous compliance examinations mandated by the USCIS, including audited financials, accountability, prudent use of investment proceeds, accurate representations of project details and meeting projected deadlines.  Participation in such a project qualifies a foreign investor to receive a green card under the EB-5 Program and also provides the investor an opportunity to make a return on his/her investment.

8.     The EB-5 Program is governed by USCIS regulations, pursuant to which foreign investors are able to obtain an investment-based permanent resident status in the United States by investing $500,000.00 in a qualifying project and proving that such investment ultimately created ten full-time jobs.

9.      Thus, not only had Plaintiff been duped into investing $800,000.00 for an ownership interest in a warehouse and a two-story refurbished apartment building located in a remote island in the Pacific Ocean, rather than a luxurious Wyndham resort, but Plaintiff was also no longer eligible to receive permanent residency status in the United States under the EB-5 Program because the fraudulent project orchestrated by the Defendants had willfully misled the U.S. government thus causing the Project to be revoked by the USCIS.

10.     As set forth below, Defendants' collective and individual conduct caused and continues to cause Plaintiff significant monetary and nonmonetary injury.

11.     Plaintiff brings this action to vindicate her rights as an EB-5 investor against Defendants and seeks not less than $1,750,000.00 in contractual damages and other relief.

## THE PARTIES

12.     Plaintiff Tianyi Wei is an individual residing in the country of Saint Kitts and Nevis with an address located at Fern Hills, Nevis.  She is a Chinese national and a qualified investor in the EB-5 Program.

13.     Defendant American Northern Marianas Economic Development Fund, LLC (the "Investment Fund") is a limited liability company organized under the laws of the State of New York with a business address located at 800 San Jose Street, Suite 101, Tinian, United States, or, alternatively, P.O. Box 520199, Tinian, MP 96952 USA.  The Investment Fund is registered through the New York Secretary of State, care of Corporation Service Company, 80 State Street, Albany, New York 12207.  The Investment Fund is not a public company and its membership interests do not trade on any exchange.  The Investment Fund oversees domestic promotional activities targeting unwitting investors seeking to obtain permanent residency through the EB-5 Program.

14. Upon information and belief, there exists a total of at least 127 investors who collectively invested approximately $63.5 million in exchange for an unknown number of Class A membership interests in the Investment Fund.

15. Plaintiff invested $800,000.00 in exchange for one unit of Class B non-managing membership interests in the Investment Fund (the "Class B Units").

16. Upon information and belief, there exists a total of three Class B Unit owners, including Plaintiff, each of whom invested $800,000.00 in exchange for one Class B Unit. Plaintiff's funds in the amount of $800,000.00 were wired to an escrow account held at Chase Bank in Flushing, New York controlled by Defendant Erik Fangshen Wang. Plaintiff's funds in the amount of $80,000.00 were wired to an escrow account for an "administrative fee" held at East West Bank in California under the control of the Defendants.

17. As of October 29, 2024, a total of $67.8 million in EB-5 funds had been invested in the Investment Fund from a total of 130 individual EB-5 investors.

18. The purported business purpose of the Investment Fund is to lend money to affiliated operating entities located in the United States Commonwealth of the Northern Mariana Islands to finance the development and construction of the aforementioned Resort (the "Project").

19. Defendant American Northern Marianas Regional Center, LLC (the "Marianas Regional Center" or "MRC") is a limited liability company organized under the laws of the United States Commonwealth of the Northern Mariana Islands with its principal place of business located at 800 San Jose Street, Suite 101, Tinian, United States, or, alternatively, P.O. Box 520199, Tinian, MP 96952 USA. MRC is an affiliate of the Investment Fund and of the Developer.

20.     MRC was previously a registered regional center with the USCIS under the EB-5 Program.  MRC's purported rights to utilize the EB-5 Program to obtain foreign investment for the purpose of qualifying direct and indirect job creation were granted to the Investment Fund for the purpose of raising capital for the development of the Project, *i.e.*, to market and sell Class B Units.  *See* Subscription Agreement, dated March 14, 2023, p.4 (annexed hereto as **Exhibit A**).  As a condition to continue to operate the Project and remain in good standing with the USCIS, the Project is subject to basic requirements required by law, including compliance examinations conducted by the USCIS officials, provision of audited financials, and construction progress reports to be filed with the USCIS on a regular basis.  Defendants have willfully failed to comply with all of these basic requirements.

21.     The Investment Fund lends money raised through the EB-5 Program to Developer, ostensibly for the purpose of funding the Project.

22.     Defendant Bridge Investment Group, LLC (the "Developer") is a limited liability company organized under the laws of the United States Commonwealth of the Northern Mariana Islands with a business address located at 800 San Jose Street, Suite 101, Tinian, United States, or, alternatively, P.O. Box 520199, Tinian, MP 96952 USA.  Developer is an affiliate of the Investment Fund.

23.     Defendant Erik Fangshen Wang ("Wang") is a United States citizen residing in Maryland, United States, with an address located at 9120 Fall River Lane, Potomac, MD 20854.  He is the owner and manager of MRC; the managing director of the Investment Fund; and the managing director of Developer.

24.     Defendant Xianjun Meng ("Meng") is a resident of the United States and of Hong Kong, USCIS # INF2280000948.  Meng is the chairman and owner of Defendant MRC.

25.     Defendant Silvia Siu ("Siu") is Meng's wife and resident of the United States and of Hong Kong, USCIS # INF2280000948.  Siu is the chief executive officer and co-owner of Defendant MRC

26.     Defendant James Huang ("Huang") is a resident of the United States, China, and Hong Kong.  Huang is responsible for promoting the Project to potential investors located in the United States and in China.  Acting on behalf of Defendants Meng, Siu, Wang, and others, Huang reports directly to Siu and directly oversees the promotional and sales operations of Defendants Investment Fund and MRC, including making fraudulent representations to investors.  Huang is purportedly an attorney at Defendant Beijing GeLi Law Firm.

27.     Defendant Canbo International Group, Ltd., ("Canbo") is a corporation registered under the laws of the British Virgin Islands with a principal place of business located at RM 1120, 11/F, Beverley Comm. Ctr., 87-105 Chatham Rd., TST KLN, Hong Kong.  Canbo is owned and operated by Defendants Wang, Meng, Siu, and Huang and is responsible for promoting the Project to potential investors in the United States and in China.

28.     Defendant Phillip T. Mendiola Long ("Long") is an individual residing on the Island of Tinian.  He is a member of the Project's "Management Team" along with Defendants Wang, Meng, Siu.  Long is also a local politician in the Northern Mariana Islands.

29.     Defendant Rudy Asuncion Pamintuan ("Pamintuan") is a Las Vegas casino operator and an individual residing in Chicago, Illinois.  He is a member of the Project's "Management Team" along with Defendants Wang, Meng, Siu, and Long.

30.     Defendant Beijing Jiabao Zhouli Consulting Co., Ltd. ("JZ Consulting") is an affiliate of Defendant Siu through which Defendants marketed the Project to investors in the United States and in China.  JZ Consulting maintains a principal place of business located at B-

1706 Vantone Financial Center, No.2, Fuchengmenwai Street, Xicheng District, Beijing, China 100037.

31.     Defendant Beijing GeLi Law Firm ("GeLi Law Firm") is also an affiliate of Defendant Siu through which Defendants marketed the Project to investors in the United States and in China.  Geli Law Firm's clients – comprised mainly of individuals seeking to obtain permanent residency in the United States through investment in a qualified EB-5 Program – were steered by Geli Law Firm to invest in the subject Project.  GeLi Law Firm's principal place of business is located at the Beijing International Enterprise Building, W955+XF3, Fuchengmen, Xicheng District, Beijing, China 100032.

## JURISDICTION AND VENUE

32.     This is a civil action over which this Court has jurisdiction under 28 U.S.C. § 1332(a)(2) and (3) because Plaintiff is a citizen or subject of a foreign state, Defendant Investment Fund is a citizen of the State of New York, and all other Defendants are citizens or subjects of a foreign state.

33.     Plaintiff is completely diverse from the Defendants and the amount in controversy exceeds $75,000.00.

34.     This Court has personal jurisdiction over Defendants by virtue of their collective business activities within the State of New York and this judicial district, including maintenance of offices within the state, numerous contacts with this jurisdiction, and conduct of business in this state, including in connection with the dispute that is the subject of this action.

35.     Further, under Section 16(c) of the Subscription Agreement, the Parties expressly agreed to submit to personal jurisdiction in the State of New York for any action or proceeding relating to the Subscription Agreement.  *See* Subscription Agreement, § 16(c) (**Exhibit A**).

36.     Venue is also proper in this Court pursuant to Section 16(c) of the Subscription Agreement and pursuant to 28 U.S.C. § 1391(b)(2) and (3), as the Parties have agreed to submit to, and waive all rights to object to, the personal jurisdiction of this Court.  *See* Subscription Agreement, § 16(c) (**Exhibit A**).

## FACTUAL ALLEGATIONS

### A.  Wang Establishes an EB-5-Funded LLC to Act as Lender to the Project

37.     On or about May 9, 2014, Wang established the Investment Fund for the purpose of seeking EB-5 investments from foreign investors.  The Investment Fund would then pool such EB-5 investments and loan that capital to Developer to finance the development of the Project.

38.     Under the operating agreement for the Investment Fund, dated July 10, 2022, MRC acted as both the "initial member" and "manager" of the Investment Fund.

39.     Under the operating agreement, non-managing membership interests (*i.e.*, Class B Unit owners) were limited to a total of 226 investors, each of which cost $800,000.00 plus an "administrative fee" payable directly to MRC in the amount of $80,000.00.

40.     Pursuant to Section 6.8.1 of the operating agreement, absent liquidation of all Class B Units, no distributions were to be made to any Member so long as any Class B Units were in issue.  Plaintiff's investment was supposed to remain in an escrow account set up by Defendant Wang located at Chase Bank's Flushing Branch in New York.  Trusting the escrow account would be maintained as promised, Plaintiff wired $800,000.00 to this escrow account as instructed by Wang.

41.     Under the operating agreement, the Class B Unit owners irrevocably appointed MRC to manage the business affairs of the Investment Fund, carry on its activities, and perform all things necessary for carrying on the Investment Fund's business.

**B.  The Tinian Ocean View Resort and Casino – Original Business Plan**

42.    After successfully obtaining a conditional gaming license issued by the Tinian Casino Gaming Control Commission in 2005, Wang established the Developer to lead development of a casino in Tinian.

43.    In 2014, MRC successfully petitioned USCIS to be designated as a "regional center" under the EB-5 Program, thus allowing MRC to source foreign capital investment to finance the development of luxury hotels, a casino, retail outlets, and transportation services.

44.    After obtaining approval under the EB-5 program in 2014, MRC began to raise EB-5 capital from foreign investors.  Over the next ten years, MRC would raise approximately $67.8 million in EB-5 funds.

45.    USCIS's initial approval of MRC's application was premised upon MRC's original 2014 business plan, which contemplated a capital raise of approximately $62 million from 124 EB-5 investors toward a total projected cost of $143 million.  These funds would be used to build the "Tinian Ocean View Resort and Casino," a 385,000 square foot luxury resort under the elite "Wyndham" brand on the Tinian Harbor, Island of Tinian, consisting of a 6-star 300-room luxury hotel, seven restaurants, four retail stores, 36 double-room suites, inter-island ferry service, and a casino with 150 "Las Vegas-style" tables and 175 slot machines (the "Original Business Plan").

46.    The Original Business Plan that the Defendants pitched to the U.S. government and to USCIS purportedly contained three phases of development: construction of a casino and a 100-room hotel by June 2022 (Phase 1); construction of 100 additional hotel rooms (Phase 2); and construction of an additional 100 hotel rooms and finalization of full casino operations with 100 electronic gaming machines and 37 game tables by June 2026 (Phase 3).

**C.  The Project Falls Behind and MRC's Financial Documentation Is Lost**

47.    In 2018, MRC submitted an updated business plan to USCIS.  The updated business plan changed the phasing of Project development and the associated timelines; instead of a three-phase development plan, the Project would now be governed by a two-phase plan.  Specifically, instead of constructing a 100-room hotel and casino to be completed by June 2022, the "new" Phase 1 would entail only the construction of a ferry terminal facility with a temporary casino, estimated to be completed by July 2019.  The "new" Phase 2 would now cover all administrative and planning activities to prepare the site for three years of construction, estimated to be completed by July 2022.  MRC projected that the actual cost of the new Phase 1 would be approximately $10.7 million.  At that time, even Phase 1 had yet to be completed.

48.    Given the drastic change in scope and scheduling proposed by MRC in the updated business plan, USCIS requested that MRC provide financial documentation, records, receipts, and invoices reflecting Project-related expenditures for the four-year time period between submission of the Original Business Plan and the 2018 updated version.

49.    In response to USCIS's request, MRC asserted that such invoices and receipts covering that time period had been kept and stored in "hard copy" only in the Developer's Tinian Office and were "destroyed" during Typhoon Yutu.  As a result, MRC would attempt to retrieve the financial information by performing searches through corporate email archives and requesting documentation from contracted vendors.  USCIS was suspicious of the far-fetched story and sent its government investigators to the Project for an on-site investigation.

**D.  Continuous Project Delays Erodes The Project's Credibility and Feasibility**

50.    On August 30, 2019, USCIS issued a Request for Information ("RFI") for the Project.  The RFI asked MRC to provide a comprehensive update on the status of the Project

generally and for MRC to provide an explanation as to why the Project's applications for a ground lease and construction permits had been rejected by the Army Corps of Engineers and the Commonwealth Ports Authority.  MRC responded to that RFI in October 2019 stating, in sum and substance, that due to continued and unanticipated delays, MRC would be submitting another updated business plan to USCIS in 2020.

51.    Upon information and belief, at some point in 2020, MRC submitted a further updated business plan to USCIS wherein MRC extended the estimated completion dates for Phase 2 by approximately eight months.

**E.  The Project Scope, Timeline, and Feasibility Changes Yet Again**

52.    In early 2022, USCIS again requested that MRC provide a comprehensive Project update, including evidence supporting Project expenditures for renovation costs of the contemplated hotel, suites, and ferry; how future development would be impacted by the labor shortage on Tinian; and information concerning the construction, construction firm, and general contractor that "built" the Tinian Diamond Hotel.

53.    Specifically, USCIS sought information and evidentiary support concerning the costs for the Tinian Diamond Hotel, whether the structure was renovated or newly constructed, the identity of the contractor who performed that construction, a copy of all construction and/or renovation contracts to which the still unidentified contractor was party, and whether said general contractor would continue to construct other components of the Project.

54.    MRC's response did not allay USCIS's concerns about the credibility of the Project.  In fact, USCIS suspected fraud was involved in the Project.

55.    In June 2022, MRC provided yet another revised business plan which, while substantially similar to the 2020 version in terms of its failure to include detailed evidentiary

support for Project expenditures to date or an explanation of the Project's capital stack, now proposed a completely revamped hotel and suite design.

56.     At all times prior to the June 2022 changes, plans for the Tinian Diamond Hotel called for construction of three separate twelve-story towers with a total occupancy of 300 luxury rooms.  Now, however, the Tinian Diamond Hotel would be comprised of only a few three-floor buildings standing on the foundations of a refurbished warehouse with a total occupancy of only 24 hotel rooms.  The Tinian Diamond Suites – originally envisioned as a standalone, extended stay luxury experience – would now be folded into the Hotel such that the total vacancy across the entire Project would be 94 rooms, a reduction of nearly 70% from the original business plan the Defendants had presented to the USCIS to obtain the EB-5 approval years before.

57.     As for the Tinian Diamond Casino – which, according to previous iterations of MRC's business plan, would ultimately create hundreds of jobs on the Island and boast a high-end gambling entertainment experience with 150 "Las Vegas-style" tables and 175 slot machines – the "fully functional" site now offered only 20 slot machines and 7 gaming tables.  This was a reduction of 80% from the original story the Defendants had presented to the USCIS to obtain the EB-5 approval years before.

## F.  An Empty Warehouse, Prefabricated Steel Structures, and a Damning U.S. Government USCIS-Issued Independent Auditor Report

58.     After tens of millions of dollars and eight years of planning, development, and construction, as of May 2022, the Tinian Ocean Resort and Casino was little more than a renovated two-story apartment building, an empty warehouse, and a few slot machines parked inside a tiny room.

59.     On May 11, 2022, USCIS officials arrived on Tinian Island to perform an on-site investigation into the status of the Project.  As it turns out, chronic delays and frequent scope

shifts were minor issues compared to what this government inspection uncovered in a massive fraud.

60.     The Tinian Diamond Hotel – originally planned as a 300-room luxury hotel and then later reduced to 24 rooms in a low-rise building – was discovered to be a two-story apartment building which the Developer converted, in part, into hotel space containing 17 "hotel" rooms.  The Developer retained the entirety of the first floor for its own use as office suite space.

61.     USCIS investigators also discovered that the Tinian Diamond Suites building – originally projected to have 36 two-room luxury suites with retail shopping and high-end restaurants – was actually a prefabricated, steel warehouse built off-island and shipped to Tinian for assembly.  USCIS could not even determine where this prefabricated structure was originally constructed or from where the steel and other components were originally sourced.

62.     The Diamond Ferry – an element of the Project originally conceived to include ownership by MRC of the vessel and the construction of a fully functional ferry terminal – had apparently been shelved in its entirety indefinitely as no construction had even begun on a terminal and the sole ferry located near the Project site was grounded, allegedly pending certification by the Coast Guard.

63.     Ultimately, on November 29, 2023, the Tinian Diamond Casino held its "grand opening."  Far from the originally projected 150 "Las Vegas-style" tables and 175 slot machines, the Casino contained only 7 tables and 18 slot machines, a 96% reduction from the original plan submitted years before by the Defendants to the USCIS for an EB-5 Project approval.

64.     The USCIS officials formally concluded that none of MRC's updated business plans contained any information or details concerning the renovation of a two-story apartment

building, the use of prefabricated steel structures (Tinian Diamond Suites), or construction of

offices for exclusive use by the Developer.

65.    USCIS demanded that MRC and the Developer explain where all of the investors'

money to the tune of tens of millions of dollars was spent.  Unsurprisingly, no explanation was

forthcoming.  The Defendants again claimed a typhoon had "destroyed" the specific financial

records sought by the USCIS that would have legitimized the Project.  Instead, USCIS received a

copy of the Developer's 2022 audited Consolidated Financial Statement and Independent

Auditor's Report – signed by a local financial auditor on July 30, 2023 – prepared by the

certified public accountancy firm Burger Comer & Associates.  The audit report was a scathing

reflection of the Project's fraudulent conduct.

66.    In that 2022 report, the auditor stated the following regarding the Developer's

financial condition:

> Management has elected to **omit substantially all** the disclosures and the statement
> of cash flows required by accounting principles generally accepted in the United
> States of America.  If the omitted disclosures and the statement of cash flows were
> included in the financial statements, they might influence the user's conclusions
> about the Company's financial position, results of operations, and cash flows.  *See*
> USCIS Decision Denying MRC EB-5 Program, dated October 29, 2024, p.7
> annexed hereto as **Exhibit B** (emphasis added).

67.    The Developer's decision to withhold obviously relevant and required financial

information from its auditor raised serious concerns within USCIS as to what the Developer

intended to conceal.

**G.  USCIS Revokes MRC's EB-5 "Regional Center" Status Based on Its Findings of Fraud**

68.    On September 12, 2022, MRC sought approval from USCIS for an investment

into a "new commercial enterprise" (the Investment Fund).  According to MRC, the Investment

Fund would raise approximately $143.1 million in capital from 226 individual EB-5 immigrant

investors and lend that pooled investment to the "job-creating entity" located on the Island of Tinian (the Developer). The loan proceeds would again then be deployed to build a luxury resort, hotel, and casino on the Tinian Harbor on the Island of Tinian. The Regional Center's business plan envisioned a 175,000 square foot, 300-room luxury resort hotel managed by Wyndham Hotels replete with various desirable amenities such as a spa, dining facilities, retail space, and ferry service. Once complete, the Project would be comprised of the Tinian Diamond Hotel, the Tinian Diamond Suites, and the Tinian Diamond Casino.

69.     MRC's September 12, 2022 application simply repeated and restated the contents of the application previously submitted to USCIS in 2014. One notable difference, however, is that MRC's 2022 application sought to raise twice as much capital as compared to its initial 2014 application ($143 million instead of approximately $75 million).

70.     Throughout the next year and a half, USCIS conveyed multiple requests for more information regarding the status of the Project, the location and use of the funds raised thus far, and the identities of the individual Defendants, particularly Defendant Wang.

71.     Ultimately, on March 15, 2024, USCIS issued a Notice of Intent to Deny ("NOID") MRC's 2022 application due to deficiencies in three requirements: a comprehensive business plan, a credible economic analysis, and bona fides of persons involved with the MRC program.

72.     The March 15, 2024 NOID informed MRC that the business plan submitted with its application was deficient as the business plan was not credible, not comprehensive, and otherwise failed to provide sufficient details to enable USCIS to reasonably determine the proposed project's ability to create jobs. In particular, USCIS noted that the Project experienced chronic development and construction delays, consistently failed to meet project development

timelines over a ten-year period, and that MRC failed to explain how it incurred actual expenditures of $75 million in building the "completed" Project.  USCIS investigators concluded the Defendants had squandered nearly $75 million of investors' money collected from the EB-5 Project.

73.    On April 10, 2024, MRC responded to the NOID and submitted additional evidence in support of its application seeking to raise capital to invest in the Investment Fund.

74.    In that response, MRC surprisingly claimed that, in fact, the Project was already complete as of Q3 2023 and that actual expenditures amounted to $75 million – a drastic decrease from MRC's initial estimate of $143 million claimed in its 2022 application.  MRC also claimed that $67.8 million in EB-5 funds raised from a total of 130 EB-5 investors had already been invested.

75.    USCIS officials repeatedly rejected the Defendants' fake story.  On October 29, 2024, USCIS formally denied the petition and revoked MRC's ability to participate in the EB-5 Program. *See* **Exhibit B**, p.3.  The misled investors were destroyed.  For nearly 3 years since the USCIS started investigating the Project, the Defendants had kept investors in the dark while continuing to raise new money from unwitting investors, including Plaintiff.  Plaintiff was lured into the scheme during the same period when USCIS was actively investigating the Project for fraud.  This fact was known to the Defendants at all relevant times.  Plaintiff was kept in the dark until the present day.

**H.  Defendants Defraud Plaintiff**

76.    Defendants Wang, Huang, Meng, Siu, and the other Defendants targeted, manipulated, and defrauded Plaintiff as follows.

77.    In early April 2022, while visiting relatives in New York and exploring potential EB-5 investment opportunities, Plaintiff was introduced to Defendant Siu.  Plaintiff and Siu began communicating via WeChat (a Chinese messaging application), where Siu informed Plaintiff that she and her affiliates, Defendants Wang and Huang, were representatives of the Developer who was involved in building a Wyndham hotel and resort on the United States Island of Tinian in the Northern Mariana Islands.  Siu then introduced the Project, the new EB-5 policy, and shared a PowerPoint presentation of the Project with Plaintiff.  According to that presentation, the Project had already been completed and was ready to open.  Defendant Siu specifically informed Plaintiff that Siu and her team were based in New York.  Siu then shared her business card with Plaintiff, which identified Siu as a director and listed three companies: Defendants Bridge Investment Group (Developer), Beijing Jiabao Zhuoli Consulting Co., Ltd., and Beijing GeLi Law Firm as Siu's affiliates in charge of marketing the Project to investors in the United States and China.

78.    On or about April 14, 2022, through Defendant Siu's introduction, Plaintiff met Defendant Huang virtually and added him on WeChat.  Huang, allegedly a registered partner of Defendant Beijing GeLi Law Firm, provided Plaintiff with his business card stating his affiliation with Defendant Beijing Jiabao GeLi International Consulting Co., Ltd., where he held the positions of Director, Senior Consultant, and law firm partner.  Siu told Plaintiff that she had been collaborating with Huang for ten years.  During multiple discussions with Plaintiff, Defendants Siu and Huang promoted the skills and experience of the members of the Project's leadership and touted their connections with powerful United States government officials.  Huang then sent Plaintiff a list of EB-5 documents, a fee schedule, and another PowerPoint presentation of the Project.

79.     Huang and Siu then invited Plaintiff to meet them at their office in New York City where Huang, Siu, and Wang's other New York-based agents would give a presentation and overview of the underlying Project. Plaintiff met with Huang, and Siu, and Wang's agents at their offices in The New York Times building in Manhattan for the presentation. As part of the presentation, Wang, Huang and Siu's agents provided Plaintiff's representative with a PowerPoint deck that described the "Resort" in vibrant, glowing detail, while omitting the fact the USCIS had an ongoing fraud investigation into the Project and the Defendants' activities. A copy of that PowerPoint presentation is annexed hereto as **Exhibit C**.

80.     On or about April 25, 2022, Huang sent Plaintiff a proposed immigration services agreement bearing the letterhead of the "Altman & An, LLP" law firm, with an office located at 37-12 Prince St., Unit 10B, Flushing, New York 11354.

81.     Later, in July 2022, Defendant Siu contacted Plaintiff and informed her that Siu had added a team of marketing staff from Defendant Canbo International Group, Ltd. ("Canbo") to assist with Plaintiff's EB-5 Program application.

82.     Siu and Huang then introduced Plaintiff to Defendant Erik Wang – the owner and manager of MRC, managing director of the Investment Fund, and managing director of the Developer. Wang told Plaintiff that he had deep ties to The White House and continuously emphasized to Plaintiff that the Project's management team consisted of experienced professionals. In contemporaneous conversations between Plaintiff and Siu, Siu, while highlighting her frequent meetings with U.S. senators, asserted that the Project was well-endorsed by U.S. government officials and that the Project was highly regulated.

83.     Throughout this time period, Siu, Huang, and their entire Beijing-based team actively promoted the Project, EB-5, E-2, and other investment immigration opportunities to

numerous investors through WeChat groups, while individually providing the Plaintiff with detailed information about the subject Project's qualifications under the EB-5 Program, highlighting its fast-track Green Card benefits.

84.     Relying on Wang, Huang, and Siu's statements and representations, Plaintiff decided to proceed with the investment.  In September 2022, Huang and Siu introduced Plaintiff to Jing An, Esq., ("Jing An") a partner of the Altman & An, LLP law firm whom Huang and Siu described as a trusted, professional lawyer based in the United States and with whom Huang and Siu had worked for many years.  Jing An sent Plaintiff a variety of promotional documents bearing the Canbo logo, along with information on fees and the investment process.

85.     On October 12, 2022, Plaintiff hired Jing An to file an immigration petition Form I-526 (Immigrant Petition by Alien Entrepreneur), entrusting her and her law firm with Plaintiff's EB-5 immigration application.  Plaintiff paid Jing An a legal fee of approximately $38,000.00.

86.     According to the engagement agreement entered into between Plaintiff and Jing An's law firm, the law firm would not be involved in Plaintiff's selection of any particular regional center or EB-5 Program project.  Unbeknownst to Plaintiff, however, Jing An and her law firm were actively representing many other investors investing in the same EB-5 Project (the subject Project at issue herein) while simultaneously advising the Defendants on fundraising for the same Project.  Jing An was fully aware of the active and ongoing USCIS investigation into the Project's legality.  The glaring conflict of interest existing between Plaintiff and Jing An was never disclosed to Plaintiff.

87.     Thereafter, all communications exchanged among Plaintiff, Wang, Huang, and Siu were coordinated by and through Jing An.  Jing An also rendered Plaintiff legal advice regarding

Plaintiff's execution of the investment documents, including the Subscription Agreement, all of which were countersigned by Wang.

88.     Since the in-person meeting in New York City, Plaintiff asked Wang, Huang and Siu questions on multiple occasions regarding the Project.  Plaintiff asked a variety of questions regarding the size of the Hotel, its anticipated opening date, the status of the Casino's operations and regulatory oversight by the relevant Tinian gaming commission, and whether the Ferry was operational.  Importantly, Plaintiff inquired as to whether the funding sought by the Project organizers would be secure and used for its intended purpose.  On or about May 12, 2022, Huang sent Plaintiff promotional articles from Defendant Beijing Jiabao Zhouli Consulting Co., Ltd. Huang then informed Plaintiff that, because the Project had transitioned from an old policy to a new "rural priority" processing policy per recent reforms to the EB-5 Program, expedited acceptance of Plaintiff's I-526 paperwork was "guaranteed."  Boasting a 100% success rate, Huang further claimed that all 100 previous applicants had received I-526 approvals without a single rejection, and that USCIS had approved the Project's request to expedite processing of new investors (such as Plaintiff).  Following this conversation, Huang and Siu continued to send Project promotional materials to Plaintiff and repeatedly invited Plaintiff to online Zoom presentations where they explained to Plaintiff the advantages of choosing to invest in the Tinian Island Project for Plaintiff's EB-5 Program application.  Huang and Siu explained to Plaintiff that under new U.S. immigration policies, investors in the Project could obtain a green card within only two years after making the required $800,000.00 investment, and, during the waiting period, Plaintiff could file USCIS Form I-485 to secure her rights to stay in and travel to the United States.  Defendants Huang and Siu repeatedly emphasized to Plaintiff that the Tinian Island Project fit squarely within this new expedited EB-5 Program.

89.     On their registered WeChat public account used to promote investment in the Project to Plaintiff and other members of the public, Siu and Huang consistently provided updates on investment immigration policy changes, application processing progress, and recorded videos explaining the benefits of investing in the Project.  Furthermore, Huang and Siu stated that since this was a long-established project, over 100 investors had successfully obtained I-526 Green Card approvals by investing $500,000 in the Project's "first phase," and that the $800,000 investment currently being promoted would be used towards the Project's "second phase."  Siu and Huang repeatedly described the $800,000 investment as "risk-free."  Siu and Huang also urged Plaintiff to act quickly, claiming to Plaintiff that although USCIS had reserved a certain number of "slots" for each $800,000 investor, only a few were still available.

90.     Throughout the third and fourth quarters of 2022, Wang, Huang, Jing An and Siu told Plaintiff via WeChat messages and via Zoom meetings that the Project was fully approved by USCIS; that the subject regional center – MRC – was qualified by USCIS as a "regional center" for the purpose of participating in raising capital through the EB-5 Program; and that the United States government had fully approved the Project because the local Tinian population, who lived in an underdeveloped area, would benefit significantly from the jobs created by the Project.

91.     Wang, Huang, Jing An and Siu also told Plaintiff that, as long as Plaintiff made the full investment of $800,000.00 and paid the required "administrative fee" of $80,000.00 within the next thirty days, Plaintiff's capital would sit in a segregated escrow account with the Flushing, New York branch of JP Morgan Chase Bank and would be protected no matter what happened with the Project or with Plaintiff's application.  Specifically, Wang, Huang, Jing An and Siu informed Plaintiff that if the Project does not work out for any reason, or if Plaintiff is

unable to obtain permanent residency through the EB-5 Program, Plaintiff's money would be immediately returned to her without any loss. Defendants consistently described Plaintiff's investment as "risk free" and "fully protected" and "safe" in escrow at that local branch of JP Morgan Chase Bank.

92.    In furtherance of their plan to convince Plaintiff to proceed with the investment, Wang, Huang, Jing An and Siu frequently appealed to Plaintiff's desire to ensure that the Project – and her investment – would in fact help underdeveloped communities in need of employment opportunities. These Defendants explained to Plaintiff that Wang – who ran Defendants Investment Fund, MRC, and Developer – was a prominent Asian-American businessman who has devoted his time and wealth to help elevate underdeveloped communities such as Tinian. Wang also claimed to Plaintiff to be a national economic advisor to The White House and a personal advisor to U.S. President George W. Bush. Wang's biography, however, was fake.

93.    On September 27, 2022, Huang sent Plaintiff a scanned copy of an I-956F receipt issued by USCIS, dated September 21, 2022, listing the company name as American Northern Marianas Regional Center LLC (Defendant MRC) with the address PO BOX 520199, Tinian, MP 96952. Huang informed Plaintiff that under the new EB-5 Program policy, the Project had been approved by USCIS, and that Plaintiff should immediately proceed with making her $800,000.00 investment and paying the $80,000.00 administrative fee so as to ensure 100% success in the Project's EB-5 program.

**I.    Plaintiff Invests $880,000 Plus Legal Fees in the Project**

94.    To make the investment, Plaintiff purchased a membership interest in the Investment Fund, the company formed to provide financing for the Project.

95.     Plaintiff was informed by Wang, Huang, Jing An and Siu that the Project was in all respects fully compliant with the rules and regulations governing an EB-5 Program; that USCIS had approved MRC's application to raise capital from foreign investors; and that Plaintiff's investment was a guaranteed success due to MRC's well-established and longstanding history as a participant in the EB-5 Program.  Siu and Huang repeatedly told Plaintiff that investing $800,000 in the Project would result in her quick acquisition of a U.S. green card. They assured Plaintiff that her application would be successfully approved in a short period of time.

96.     Specifically, Wang, Huang and Siu told Plaintiff that if for any reason the underlying Project did not work out, or if Plaintiff was unable to obtain her green card for reasons unrelated to the Project, Plaintiff's entire investment would remain segregated and protected in the segregated JP Morgan Chase Bank escrow account and returned to her in full.

97.     On March 14, 2023, Plaintiff entered into the American Northern Marianas Economic Development Fund LLC Subscription Agreement.  Pursuant to the Subscription Agreement, Plaintiff was instructed to wire $800,000.00 to the Investment Fund's segregated EB-5 account and pay the requisite $80,000.00 "administrative fee" to MRC's operating account. On March 16, 2023, Plaintiff received from Wang via Fedex the original hard copy Subscription Agreement signed by Wang.

98.     On April 13, 2023, Plaintiff made the $800,000.00 investment via a wire transfer to the Investment Fund's business account custodied by non-party JP Morgan Chase Bank, N.A., at the branch located at 39-01 Main Street, Flushing, New York 11354.

99.    That same day, Plaintiff paid the $80,000.00 administrative fee to MRC via wire transfer to MRC's business account custodied by non-party EastWest Bank, at the branch located at 9300 Flair Drive, 4th Floor, El Monte, California 91731.

100.    Plaintiff then submitted her I-526E – Immigrant Petition by Regional Center Investor to USCIS, which had been prepared by Plaintiff and Jing An pursuant to Jing An's legal advice.  In accordance with the terms of the Subscription Agreement, Plaintiff then provided Defendants with a copy of the USCIS notice confirming receipt of Plaintiff's petition, dated June 2, 2023.

101.    Pursuant to the June 2, 2023 notice confirming USCIS' receipt of Plaintiff's petition, Plaintiff was thereafter required to submit to USCIS a copy of the receipt notice from the Regional Center's Application for Approval of an Investment in a Commercial Enterprise (USCIS Form I-956F) which, per USCIS regulations, must be submitted by the subject regional center to USCIS.

102.    According to USCIS regulations, a regional center must file an I-956F application for each investment offering through a "new commercial enterprise" before any foreign investor can file their I-526E – Immigrant Petition.  Put differently, the subject development for which investment is sought must first be approved by USCIS as a legitimate EB-5 Program project.  Once approved, only then can the subject regional center legally accept money from foreign investors under the auspices of the EB-5 Program.

103.    As it turns out, Plaintiff's investment was not only far from safe, but Plaintiff would not be able to obtain the permanent residency benefit integral to an investment in an EB-5 Program-approved project.

104.    Between the date of her investment (April 13, 2023) and January 23, 2025,
Plaintiff consistently checked in with Wang, Huang, Jing An, and Siu on the progress of the
Project through telephone calls, messages, and email exchanges with Huang, Jing An and Siu.
Throughout this time period, Wang, Huang, Jing An and Siu reassured Plaintiff that her
investment was safe because the funds had been escrowed in a segregated account at JP Morgan
Chase.  Wang, Huang, Jing An and Siu also provided Plaintiff with positive yet bogus updates on
the progress of the Project.  Among many such communications, for example, Wang, Huang,
Jing An and Siu told Plaintiff that USCIS had just performed an on-site visit to Tinian and that
USCIS personnel, impressed by the majesty of the Project, were more than satisfied as to the
viability of the Project as a job creator. Defendants' statements and representations made to
Plaintiff were contrary to the truth, as USCIS had conducted a fraud investigation on both the
Project and on the activities of the Defendants.

105.    At no point in time prior to January 23, 2025, including during the time period
when Plaintiff was lured into investing in the Project, did any Defendant or her lawyer Jing An,
including Wang, Huang, Meng and Siu, indicate to Plaintiff that the Project had been shut down
by USCIS, that MRC's status as a "regional center" had been revoked or in jeopardy, or that as a
result of such revocation, Plaintiff's petition seeking permanent residency would never be
granted.

106.    Defendants, however, were well aware that by the time Plaintiff had made her
investment in April 2023, the Project had already been deemed noncompliant with the EB-5
Program rules and regulations as promulgated by USCIS for over a year.

107.    Indeed, despite having knowledge of the Project's noncompliance with the EB-5
Program, Defendants and her attorney Jing An failed to inform Plaintiff of same at any point in

time before or after Plaintiff entered into the Subscription Agreement and invested her money. Plaintiff made multiple attempts to contact attorney Jing An seeking a full refund of her investment purportedly sitting in an escrow account held at the JP Morgan Chase Bank branch in Flushing, New York.  Jing An, however, consistently ignored Plaintiff's calls.

108.    Defendants and Jing An also failed to inform Plaintiff that MRC's Application for Approval of an Investment in a Commercial Enterprise (USCIS Form I-956F), dated September 12, 2022, had already been denied by USCIS as of July 30, 2023.

109.    Plaintiff entered into this investment based on solicitation information provided or prepared in New York by Defendants.  The Defendants, particularly Wang, Huang and Siu, acted as promoters for the Project and fraudulently induced Plaintiff to invest into the Project by misrepresenting the nature of the investment and how Defendants intended to and did in fact treat Plaintiff's investment.  Defendants continued that fraud by not only failing to keep Plaintiff's investment funds in a segregated escrow account, but also by intentionally feeding Plaintiff positive yet bogus updates despite knowing that the Project had already been shut down.

110.    The truth had been hidden from Plaintiff at every step of the way before, during, and after Plaintiff had invested in the doomed Project shut down by the U.S. government.

**J.  Plaintiff Learns the Truth About the Project**

111.    On January 23, 2025, Huang informed Plaintiff that USCIS denied the Project's EB-5 Program application.  However, Huang urged the Plaintiff to "stay quiet" and be "patient."

112.    Plaintiff then called her attorney Jing An, Meng, Siu to confirm what she had heard from Huang – that the Project was denied by USCIS and, consequently, Plaintiff would not be able to obtain permanent residency in the United States.

113.    Jing An and Siu, however, explained that the Project's application was only "on hold" and not denied.  Plaintiff pressed Siu further, demanding that Siu provide a concrete answer as to the status of the Project.  In response, Siu simply made up an excuse by stating that the Project would remain on hold because the United States and China could soon go to war with each other, but that as soon as everything cooled down, MRC's application would be approved.

114.    Plaintiff then demanded that Siu immediately return her money, to which Siu replied that she would first need to contact Wang and Jing An as they were both U.S. citizens residing in the United States who could return her money.

115.    Plaintiff did not hear back from Siu, or from Wang, or from any other person or representative involved with the Project until February 12, 2025.  Plaintiff has contacted her attorney Jing An on multiple occasions urging her to assist with returning her money but to no avail.

116.    On February 12, 2025, Huang sent Plaintiff a copy of a letter sent to Wang from USCIS dated October 29, 2024 (**Exhibit B**).  It was clear from the USCIS letter that Plaintiff had been defrauded before, during and after her investment was made into the fraudulent Project perpetrated by the Defendants.

117.    That letter issued by the USCIS informed Wang that MRC's Application for Approval of Investment in a Commercial Enterprise was denied (**Exhibit B**).

118.    Since then, all of Plaintiff's attempts to make contact with Defendants have been ignored.

**COUNT I**
**(FRAUD AS AGAINST ALL DEFENDANTS)**

119.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-118 above as if fully set forth herein.

29

120.    Plaintiff was induced by fraudulent misrepresentations and omissions provided by Defendants for inclusion in the Subscription Agreement, the Operating Agreement, and in the various promotional materials, including the PowerPoint deck, to invest in the Project.

121.    Plaintiff understood, as alleged above, that she was investing as a minority owner in MRC and thus should have shared in distribution of profits and/or losses from the development and operation of the Project.

122.    The Subscription Agreement, the Operating Agreement, and the various promotional materials upon which Plaintiff relied, as set forth in greater detail above, included fraudulent or misleading information provided by Defendants in the form of misstatements and/or omissions:

   a.    In the manner in which it described the nature of the investment as equity when, in reality, it was an unsecured loan;

   b.    In the way in which it led Plaintiff to believe that her investment would be kept in a segregated escrow account custodied by JP Morgan Chase at all times thereafter, and that should the Project not be completed, such escrowed funds would immediately be returned in full to Plaintiff;

   c.    In the way in which it described how Plaintiff would be investing in MRC as a member of 226 other investors when in fact only two other individuals purchased Series B Units;

   d.    In the manner in which it failed to disclose facts necessary to make the stated disclosures not misleading;

e.  Deceptive in the manner in which the subject documents and materials were drafted to mislead Plaintiff into believing that her investment would be an equity investment in RMC;

f.  In failing to disclose that, by the time Plaintiff made her investment, Defendants had already spent approximately $75 million towards the Project with only a two-floor apartment building and refurbished warehouse to show for it;

g.  In that it failed to disclose the real conflicts of interest that all Defendants had in connection with Plaintiff's investment.

123.  Each of the material misrepresentations identified above were written and approved by Defendants.

124.  Each of the material omissions identified above represent essential facts concerning the form and structure of Plaintiff's investment in the Project and the operation of the Project as to which the Defendants had superior and sole knowledge such that the failure to disclose such information rendered Plaintiff's investment inherently unfair, or was of such a character as would have been required to be disclosed in order to clarify false impressions made by the Defendants' provision of materially incomplete information.

125.  The misrepresentations and omissions were material to the decision of Plaintiff to make her investment in the Project and Defendants knew that these misrepresentations and omissions were material.

126.  Defendants knew that the misrepresentations were false at the time that they were made or were misleading and incomplete and failed to correct them at the time they were made or at any point following.

127.     Defendants knew that the misrepresentations were false or misleading and were false or misleading statements of existing fact.

128.     Defendants intended for Plaintiff to rely on these misrepresentations or omissions or false statements and Plaintiff reasonably did rely on them to her detriment.

129.     Defendants intentionally obfuscated which Defendant was responsible for which section or part of the assorted materials and documents.

130.     Defendants hid who was making which statement in the materials or who was responsible for which statement being incomplete and misleading by omission.

131.     Plaintiff thus reasonably relied on the fact that all Defendants played a role in the drafting and approving of the various promotional materials for prospective investors, including Plaintiff.

132.     Plaintiff did not know and with the exercise of due and reasonable diligence could not have discovered that the statements and representations upon which she relied were false or misleading.  Defendants obfuscated their lies, false statements, and misrepresentations such that Plaintiff could never have discovered the true state of affairs.

133.     Had the Plaintiff known of the true structure and nature of the investment, Plaintiff either would never have instead in the Project or would have insisted on substantial changes to the structure and nature of the Project and investment therein to protect herself as a junior unsecured creditor in an otherwise abusive situation.

134.     Plaintiff was damaged by no later than February 12, 2025 when Defendants refused to return to Plaintiff the funds she invested, with Defendants unjustly benefiting from continued possession of Plaintiff's investment funds.

135.     Plaintiff has been damaged in an amount to be proven at trial but believed to be in excess of all jurisdictional limits of this Court.

136.     Defendants are jointly and severally liable for Plaintiff's losses individually and collectively.

## COUNT II
## (NEGLIGENT MI SREPRESENTATION AS AGAINST ALL DEFENDANTS)

137.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-136 above as if fully restated herein.

138.     Plaintiff was induced by negligent misrepresentations compiled and confirmed by Defendants for use in promotional and offering materials to invest in the Project.

139.     Defendants had a special relationship with Plaintiff imposing upon them a duty to impart correct information.

140.     Plaintiff understood, as alleged above, that she was investing as an indirect equity owner in MRC and thus should have shared in distributions of profits and/or losses from the development and operation of the Project.

141.     The Subscription Agreement, the Operating Agreement, and the various promotional materials upon which Plaintiff relied, as set forth in greater detail above, included fraudulent or misleading information provided by Defendants in the form of misstatements and/or omissions:

    a.  In the manner in which it described the nature of the investment as equity when, in reality, it was an unsecured loan;

    b.  In the way in which it led Plaintiff to believe that her investment would be kept in a segregated escrow account custodied by JP Morgan Chase at all times thereafter,

and that should the Project not be completed, such escrowed funds would immediately be returned in full to Plaintiff;

c.  In the way in which it described how Plaintiff would be investing in MRC as a member of 226 other investors when in fact only two other individuals purchased Series B Units;

d.  In the manner in which it failed to disclose facts necessary to make the stated disclosures not misleading;

e.  Deceptive in the manner in which the subject documents and materials were drafted to mislead Plaintiff into believing that her investment would be an equity investment in RMC;

f.  In failing to disclose that, by the time Plaintiff made her investment, Defendants had already spent approximately $75 million towards the Project with only a two-floor apartment building and refurbished warehouse to show for it;

g.  In that it failed to disclose the real conflicts of interest that all Defendants had in connection with Plaintiff's investment.

142.    These misrepresentations and omissions were material to the decision of the Plaintiff to invest in the Project and Defendants knew that these misrepresentations and omissions were material.

143.    Defendants knew that the misrepresentations were false at the time that they were made or were misleading and incomplete and failed to correct them at the time they were made or at any point following.

144.    Defendants knew that the misrepresentations were false or misleading and were false or misleading statements of existing fact.

145.     Plaintiff relied on the special knowledge or position of Defendants to provide accurate information or relied on the special relationship with Defendants (who were to be the trusted guardians of Plaintiff's investments) and thus were under a duty to provide accurate information.  Plaintiff reasonably did rely on them to her detriment.

146.     Defendants intentionally or negligently obfuscated which Defendant was responsible for which section or part of the promotional materials.

147.     Defendants thus hid who was making which statement in the materials or who was responsible for which statement being incomplete and misleading by omission.

148.     Plaintiff thus reasonably relied on the fact that all Defendants played a role in the drafting and approval of the promotional materials to prospective investors, including Plaintiff.

149.     Plaintiff reasonably relied on Defendants' superior knowledge and positions of trust and responsibility.

150.     Plaintiff did not know and with the exercise of due and reasonable diligence could not have discovered that the statements and representations upon which she relied were false or misleading.  Defendants hid their lies, false statements, and misrepresentations such that Plaintiff could never have and did not discover the true state of affairs.

151.     Had the Plaintiff known of the true structure and nature of the investment, Plaintiff either would never have invested in the Project or would have insisted on substantial changes to the structure and nature in order to project herself as a junior unsecured creditor in an otherwise abusive situation.

152.     Plaintiff was damaged by no later than February 12, 2025 when Defendants refused to return to Plaintiff the funds she invested, with Defendants unjustly benefiting from continued possession of Plaintiff's investment funds.

153.     Plaintiff has been damaged in an amount to be proven at trial but believed to be in excess of all jurisdictional limits of this Court.

154.     Defendants are jointly and severally liable for Plaintiff's losses individually and collectively.

## COUNT III

## BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS

155.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-154 above as if fully restated herein.

156.     Defendants, as promoters of investments in the Project, owed Plaintiff the fiduciary duties of good faith, loyalty, and full and fair disclosure of all material facts and information relevant to the investment decision presented to Plaintiff.

157.     Defendants breached their respective fiduciary duties to Plaintiff and aided and abetted each other in doing so by concealing and failing to disclose the true structure of the investment and by failing to, as set forth above, make full, fair, and not misleading disclosures concerning the investment in the Project.

158.     Defendants also breached their fiduciary duties by failing to disclose their intentions concerning their own investment of capital and their intention to eliminate their exposure to the risk of the Project by taking their capital out through payments to affiliates purportedly performing work on the Project for the benefit of Plaintiff and other investors while still causing Plaintiff's capital to remain at risk. The Defendants also

caused fees to be paid to their own affiliated entities which fees constituted a diversion of funds from the Project in breach of their fiduciary duties.

159.    Defendants are fiduciaries to Plaintiff.  Defendants were charged with the operation of the business of the Project and its affairs and had and has control over the monies and accounts of the Investment Fund which were invested with it.

160.    Defendants owed Plaintiff and all other investors duties of good faith, care, undivided loyalty, and a duty to make full and fair disclosure of all material facts concerning the Project and the operations of MRC and the Developer, both prior to the investment being made and after Plaintiff made her investment.  Not only did Defendants not act in conformity with the previously stated fiduciary duties that they owed to Plaintiff but they knew both prior to and at the time that Plaintiff made her investment that they were not acting in conformity with those duties.

161.    As set forth above in detail, Defendants breached their fiduciary duties by:

    a.  Failing to ensure that the materials used in the offering materials accurately and fairly recounted the risks and the loan structure that was contemplated at the time of the solicitation;

    b.  Failing to safeguard Plaintiff's investment;

    c.  Failing to keep books and records properly;

    d.  Failing to monitor Plaintiff's investment;

    e.  Diverting the assets in the form of Plaintiff's investment for Defendants' own benefit;

f. Failing to make certain that the offering materials fairly and correctly set forth the real terms and conditions and structure of the investment that Plaintiff would be making;

g. Failing to use funds generated from operational activities to repay Plaintiff's investment;

h. Failing to timely distribute financial information or audit reports;

i. Failing to disclose to Plaintiff that the Project was losing money, and/or was insolvent;

j. Failing to disclose to Plaintiff that the MRC had its designation as a "regional center" revoked, that the Project had already been deemed "complete" as of Q3 2023, and that the Project had lost its ability to receive EB-5 Program investments;

k. Failing to honestly communicate with Plaintiff;

l. Failing to disclose to Plaintiff the true number of individual Series B Unit investors investing alongside Plaintiff by falsely informing Plaintiff that at the time of her investment, ten (10) individual investors had already invested in the Project and had already successfully submitted their Form I-526E applications, where in reality, there existed only three (3) such investors, including Plaintiff; and

m. Failing to disclose to Plaintiff that Defendants had irreconcilable conflicts of interests as manager, payment recipient, and promoter.

162.    Defendants misappropriated millions of dollars while, at the same time, failing to distribute any repayment to Plaintiff or other investors.

163.     In managing the investment, Defendants put their own interests above Plaintiff's interests, without excuse or waiver.

164.     Plaintiff has been damaged.

165.     Plaintiff seeks money damages in an amount to be proven at trial but believed to be in excess of all jurisdictional requirements of this Court.

166.     Defendants should be ordered, furthermore, to disgorge all of the ill-gotten gains and benefits Defendants wrongfully obtained as a result of their breaches of fiduciary duty, including the fees, interest, profits, origination or administrative fees, membership distributions, and/or commissions they have received in association with the Project and Plaintiff's investment.

167.     Defendants are jointly and severally liable.

**COUNT IV**
**UNJUST ENRICHMENT AGAINST ALL DEFENDANTS**

168.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-167 above as if fully restated herein.

169.     Defendants are fiduciaries to Plaintiff and thus there were sufficient relationship upon which Plaintiff could rely.

170.     Defendants were charged with the operation of the business of the Project and its affairs and had and has control over the funds and accounts of the Investment Fund which were invested with Defendants.

171.     Defendants removed without authorization or justification at least the amount of Plaintiff's investment for their own benefit and use, and thus were unjustly enriched. It is against equity and good conscience to permit Defendants to retain those funds.

172.      Plaintiff seeks the disgorgement and return of all such funds retained by Defendants.

**COUNT V**
**CONSTRUCTIVE TRUST AGAINST ALL DEFENDANTS**

173.      Plaintiff repeats and realleges the allegations set forth in paragraphs 1-172 above as if fully restated herein.

174.      Defendants were fiduciaries to Plaintiff with respect to the use and expenditures of the funds contributed by Plaintiff by reason of said Defendants' solicitation of Plaintiff, control of the Project and funds of the Plaintiff, possession of superior knowledge and skill regarding the mutual enterprise of Plaintiff and Defendants, and the representations to the Plaintiff that Defendants would use that superior knowledge and skill and the money invested by Plaintiff to their mutual advantage.

175.      As fiduciaries to Plaintiff, Defendants each owed duties of full disclosure of all material facts relevant to the investment in the Project.

176.      As set forth above, Defendants failed to make full and fair disclosure concerning the structure of the investment in the Project and the intended operation of the Project.

177.      Defendants failed to make the required disclosures intentionally and to enable themselves to personally benefit from the investment made by Plaintiff.

178.      Plaintiff relied upon Defendants to make full and complete and not misleading disclosures and were deceived and misled by Defendants' failure to do so.

179.      This failure by Defendants to make full and complete disclosures of the facts and circumstances concerning the Project was constructively fraudulent.

180.      Defendants were unjustly enriched by their taking out millions of dollars in unjustified fees, distributions, and expenditures to affiliates at the expense of the Plaintiff

and other investors.  It is against all equity and good conscience to permit them to retain these funds.

181.    Plaintiff was damaged thereby in an amount to be proven at trial but believed to be in excess of all jurisdictional requirements of this Court.

182.    Each Defendant should be held to be jointly and several liable for these damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.  Awarding damages to Plaintiff in an amount to be determined at trial but believed to be no less than One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00), plus pre- and post-judgment interest;

B.  Awarding Plaintiff the costs, fees, and expenses incurred in this action, including without limitation, reasonable attorneys' fees to the extent permitted by law;

C.  For pre-judgment interest and post-judgment interest at the maximum rate provided by law; and

D.  Awarding Plaintiff such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: New York, New York
       February 24, 2025

                                Respectfully submitted,

                                THE POSTLETHWAITE LAW FIRM PLLC

                                _____

41

Preston J. Postlethwaite, Esq.
100 Park Avenue, 16th Floor
New York, New York 10017
PJP@postlethwaitelaw.com
(646) 389-3202 (phone)
(646) 619-4733 (fax)
*Attorneys for Plaintiff Tianyi Wei*